UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHER LYNN JUSTICE,

     Plaintiff                         Civil Action No.  16-12448

v.                                   HON. AVERN COHN
                                     U.S. District Judge
                                     HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Cher Lynn Justice ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED and that Plaintiff's  Motion for Summary Judgment [Docket #15] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 11 and July 25, 2013 respectively, alleging disability as of January 10, 2011 (Tr. 164-165, 166-171). Upon initial denial of the claim,

Plaintiff requested an administrative hearing, held on December 16, 2014 in Lansing, MI (Tr. 27). Administrative Law Judge ("ALJ") Paul W. Jones presided. Plaintiff, represented by Charles Robinson, testified (Tr. 31-56, 60-71), as did Vocational Expert ("VE") Amelia L. Shelton (Tr. 56-60). On January 23, 2015, ALJ Jones found that Plaintiff was not disabled (Tr. 12-21). On May 10, 2016, the Appeals Council denied review (Tr. 1-5). Plaintiff filed a judicial appeal of Defendant's determination in this Court on June 29, 2016.

## II.   BACKGROUND FACTS

Plaintiff, born March 18, 1972, was 42 at the time of the administrative decision (Tr. 21, 164). She completed one year of college and worked previously as a cashier, machine operator, and production operator (Tr. 193). She alleges disability due to anxiety resulting from Post Traumatic Stress Disorder ("PTSD"), fibromyalgia, and uveitis[1] (Tr. 192).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She stood 5' 7" and weighed 160 pounds (Tr. 31-32). She had been divorced for 13 years and currently lived in an apartment with her youngest son, 12 (Tr. 32). She supported the two of them with child support payments, food stamps, and help from her adult children (Tr. 33-34). She received health care coverage through Medicaid (Tr. 33). She collected unemployment benefits shortly after ceasing work but did not seek work due to a worsening of symptoms (Tr. 35). At one point, she received a "lump sum" payment through her short-

---

[1]

"Uveitis is a form of eye inflammation . . . affect[ing] the middle layer of tissue in the eye wall." http://www.mayoclinic.org/diseases-conditions/uveitis/basics/definition/con-20026602 (last visited August 9, 2017). Symptoms "include eye redness, pain, . . . blurred vision" and light sensitivity. *Id.* Treatment typically includes corticosteroid administered as eye drops, pills, or injections. *Id.*

term disability provider (Tr. 37).

In her former job(s) as an inspection/parts operator, she was required to lift up to 20 pounds (Tr. 38, 43). She would be unable to return to the former position due to fatigue and pain due to fibromyalgia (Tr. 39). Fibromyalgia caused intermittent neck, back, and knee pain (Tr. 39). At times upon waking, she "wasn't mobile" and was unable to move her arm (Tr. 39-40). The condition would worsen over a three to four-day period to the extent that she required Ace bandages and the use of crutches (Tr. 40). She currently saw a rheumatologist (Tr. 41). She had also been diagnosed with osteoarthritis of the knees (Tr. 41).

Plaintiff also experienced light sensitivity and irritation due to the condition of uveitis in both eyes (Tr. 44). She coped with the eye pain by reclining (Tr. 45). At times, the condition caused vision problems (Tr. 45). Plaintiff did not drive due to anxiety (Tr. 46). She wore contact lenses when she did drive but was able to see fairly well without the use of contacts (Tr. 47).

Plaintiff's limitations as a result of anxiety and other mental problems were worse than her physical problems (Tr. 48). She was working with a therapist to reduce symptoms of anxiety (Tr. 50). On the rare occasions that she drove, she used "foursquare breathing" to reduce her anxiety (Tr. 50). She smoked a total of one joint a week that friends gave her for pain management (Tr. 53-54). She had been using marijuana since the age of 15 (Tr. 54). She did not get "high" from the daily marijuana but got "energy" and pain relief (Tr. 55).

In response to questioning by her attorney, Plaintiff reported that she had treated with a rheumatologist for two years and had been prescribed Lyrica and Flexeril (Tr. 60). She experienced the side effect of drowsiness but that she was "getting more used to it" (Tr. 61). She also took Abilify for depression and Xanax for anxiety stemming from PTSD (Tr. 62).

She coped with the side effect of drowsiness by lying down after taking her medication (Tr. 63). The condition of spinal scoliosis also contributed to her back pain (Tr. 63-64). The condition of fibromyalgia led to "muscular degeneration" (Tr. 64).

Due to her mental health problems, Plaintiff's outings were limited to taking her son to school and going to the store, adding that she took Xanax before she went to the store to avoid excessive anxiety (Tr. 65). Her adult children helped her out "tremendously" by shopping for her (Tr. 66). She denied suicidal ideation (Tr. 66). She experienced daily low moods and nervousness in "crowds" of more than one person (Tr. 66). She experienced concentrational problems characterized by the inability to understand a movie, forgetting to turn the oven off, and leaving the door unlocked (Tr. 67). "Bad days," in which she experienced fatigue and anxiety, occurred two to three days a week (Tr. 67). She did not have current hobbies (Tr. 68). Her body pain was exacerbated by doing household chores, sitting in one place for more than 30 minutes, and cold weather (Tr. 69). She spent approximately one-quarter of her waking hours reclining (Tr. 70).

### B. Medical Records[2]

### 1. Treating Records

July, 2009 treating records note Plaintiff's report of ongoing hand pain (Tr. 316). She reported good results from Xanax (Tr. 316). Plaintiff appeared anxious (Tr. 316). A review of systems was unremarkable (Tr. 316). An October, 2009 ultrasound of the abdomen was unremarkable (Tr. 325). Treating notes from the same month note full orientation with appropriate judgment and insight and a good memory (310). In November, 2009, Peter

---

[2]Records predating the alleged onset of disability date of January 10, 2011, to the extent discussed here, are included for background purposes only.

Chang, M.D. observed that Plaintiff appeared in no acute distress with appropriate judgment and insight and full orientation (Tr. 310). Plaintiff reported lessened anxiety with Xanax (Tr. 312). Plaintiff came to the appointment by herself (Tr. 310). Plaintiff expressed concern that she was pregnant and reported "crippling" daily body pain (Tr. 310-312). Dr. Chang's notes from the next month state that he refused to prescribe Vicodin "for pain that we are not clear about" (Tr. 307). He noted that Plaintiff "was very demanding as to getting [narcotic] pain meds" (Tr. 307). She came to the appointment unaccompanied (Tr. 306).

January, 2010 treating records by Mark D. Richardson, M.D. note Plaintiff's report of generalized arm and abdominal pain (Tr. 301). Dr. Richardson's notes from the following month state that he was discharging her as a patient on the basis that she had been "overusing" both Xanax and Vicodin (Tr. 297). He noted "multiple complaints [of pain] that all seem to run together" (Tr. 297). He declined to "be involved in any further action . . . related to . . . work restrictions or [Workers' Compensation]" (Tr. 297). The following month, pain specialist Andrew K. Alshab, M.D. noted that while Plaintiff reported of level "10" pain, she smiled throughout the entire interview (Tr. 594). Dr. Alshab diagnosed her with cervicalgia and possible arthritis (Tr. 595). In March, 2010, Plaintiff failed to follow through with a course of physical therapy (Tr. 615-616). Emergency room notes from the same month state that Plaintiff requested but was denied "pain medicine to go" (Tr. 614). Between June, 2010 to February, 2011, internist Eugene Willoughby, M.D. found that Plaintiff was intermittently unable to work due to anxiety, stress, and fibromyalgia (Tr. 415-428).

March, 2011 psychological intake records by Summit Pointe note a GAF of 46 due to anxiety and personality disorders, fibromyalgia, and unemployment[3] (Tr. 578).  Intake staff member Ludmilla Lepeschkin noted an unremarkable thought content, full orientation, an appropriate affect, and normal behavior (Tr. 576).

May, 2011 psychological intake records by Wisam Salman, M.D. note Plaintiff's report of stress resulting from a false positive for breast cancer, the February, 2011 termination of her job, and the death of both her mother and dog the previous year (Tr. 406). Dr. Salman noted a depressed affect with anxiety (Tr. 407).  He assigned her a GAF of 50 due to depression, anxiety, arthritis of the neck, fibromyalgia, and the psycho social stressors of financial difficulties, job termination, and the loss of her mother and dog (Tr. 407).  Dr. Salman prescribed individual therapy, Klonopin, and an increased dosage of Cymbalta, cautioning that Plaintiff should not drive while under the influence of Klonopin (Tr. 407).

In June, 2011, Timothy D. Hoffman, M.D. noted Plaintiff's report that Tramadol dosages had caused fatigue at first but she was "used to them" (Tr. 304).  A physical examination was unremarkable (Tr. 304).  Dr. Hoffman observed that Plaintiff appeared anxious and mildly depressed (Tr. 304).  Dr. Salman's notes from the same month note an improvement in anxiety and depressive symptoms (Tr. 405).  Plaintiff reported that she was considering an application for disability benefits due to her physical limitations (Tr. 405).

---

[3]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*"), 34.

The following month, Plaintiff sought rheumatological treatment for polyarthalgia (Tr. 367). Imaging studies of the right foot, pelvis and bilateral hands and knees were unremarkable (Tr. 361-366). Rheumatologist Syed Hasan Raza, M.D. made a preliminary diagnosis of fibromyalgia but noted that a physical examination was unremarkable with the exception of tenderness of the cervical and upper thoracic spine (Tr. 359). He noted that MRIs of the cervical and lumbar spine showed at most only mild degenerative disc disease (Tr. 359, 484, 612). He encouraged Plaintiff to "stay active" and "start swimming" (Tr. 359). Plaintiff reported an improvement in symptoms with Cymbalta (Tr. 356). Dr. Raza noted a diagnosis of "intermediate uveitis" in the previous year brought on by a right retinal tear (Tr. 356). She indicated that she "rarely" used prescribed steroid drops which she stated quelled eye pain and light sensitivity (Tr. 356). Dr. Raza noted a normal eye appearance (Tr. 354).

Dr. Salman's September, 2011 counseling sessions state that Plaintiff was "going out more" with a friend (Tr. 402). In November, 2011 Dr. Hoffman noted trapezius tender points with "very" light touch (Tr. 303). He found that fibromyalgia was "a likely diagnosis" but that stress and Plaintiff's "unhealthy lifestyle," included smoking, contributed to her physical problems (Tr. 303). He noted Plaintiff's report that "the union" was "trying to get her job back" (Tr. 303). He opined that if Plaintiff got her "job back" she would "likely . . . improve at least some" (Tr. 303). Dr. Salman's notes from the same month note that Plaintiff reported that she limited her alcohol intake to once or twice a month at times she went out with friends or family members (Tr. 400). Dr. Salman encouraged Plaintiff to continue to socialize (Tr. 400). The following month, Dr. Raza characterized the fibromyalgia symptoms as "episodic" (Tr. 350). Plaintiff reported that she did "not want to go to physical therapy. . ." (Tr. 350). Documentation from Summit Pointe psychological services indicates that Plaintiff did not follow through with treatment after March, 2011 (Tr. 559).

Dr. Salman's January, 2012 counseling records state that Plaintiff was encouraged to deal with a recent traffic ticket (Tr. 398). Dr. Raza's February, 2012 records state that the uveitis symptoms were under control (Tr. 344). He noted a full range of motion in the upper extremities and a normal neurological examination (Tr. 346). He documented 14 tender points (Tr. 346). The same month, Plaintiff reported an improvement in her mental condition (Tr. 397). Dr. Salman's March, 2012 records state that Plaintiff was approved for short-term disability[4] (Tr. 396). The following month, she reported that she had gotten her driver's license back and was purchasing auto insurance (Tr. 395). In May, 2012, Plaintiff denied current symptoms of uveitis (Tr. 340). Plaintiff reported stress "due to economic problems" (Tr. 340). Dr. Raza noted "no evidence of inflammatory arthritis . . ." (Tr. 342). He found that Plaintiff's treatment would be limited to an "as needed basis" (Tr. 342). Dr. Salman's August, 2012 records state that Plaintiff went out with her friends twice a week (Tr. 392). His notes from the following month note "mild" depression (Tr. 391). In October, 2012, Dr. Salman noted that Plaintiff was not interested in counseling (Tr. 391). Dr. Salman's December, 2012 records note Plaintiff's increased stress as a result of her house foreclosure (Tr. 389).

Dr. Salman's April, 2013 records state that Plaintiff continued to experience stress due to the housing situation but had recently begun dating (Tr. 386). In June, 2014, Plaintiff resumed treatment with Summit Pointe services (Tr. 555). Jay Skaggs, L.L.P.C. conducted an intake interview, noting weekly marijuana use (Tr. 554). Skaggs assigned Plaintiff a GAF of 41 due to anxiety and personality disorders; fibromyalgia and rheumatoid arthritis; and occupational and financial problems (Tr. 552-553). Skaggs noted fair insight, "good/normal"

---

[4]

While the March, 2012 records state that she was approved for long-term disability, April, 2012 records indicate that the approval was for short-term disability (Tr. 395).

memory, full orientation, and "normal/alert" behavior (Tr. 551). He noted a "small but healthy primary support group" (Tr. 548). July, 2014 treating records state that Plaintiff continued to worry about finances (Tr. 536). She exhibited a normal thought process and orientation (Tr. 536). August, 2014 imaging studies of the bilateral feet showed "minimal hammertoe deformities" but were otherwise unremarkable (Tr. 582-583). Imaging studies of the bilateral knees were essentially unremarkable (Tr. 584-585). Plaintiff reported worsening neck pain (Tr. 588). In September, 2014, Sven Zethelius, M.D. performed a psychiatric evaluation, noting Plaintiff's report of seasonal affective disorder, PTSD, and sleep apnea (Tr. 527-530). The same month, Dr. Salman recommended increasing Plaintiff's dosage of Abilify and continuing the Cymbalta and Xanax (Tr. 596). He noted that she was appropriately dressed with a normal thought process and good eye contact (Tr. 596). Skaggs' records from the same month note that Plaintiff was encouraged to use breathing exercises to control anxiety (Tr. 525). The same month, Plaintiff was prescribed steroid eye drops for daily use (Tr. 682). The following month, Plaintiff returned for treatment with Dr. Raza after an 18-month hiatus (Tr. 671). Imaging studies of the knees, feet, and elbows were essentially unremarkable (Tr. 659-660, 666-670).

In December, 2014, Skaggs completed a Mental Residual Functional Capacity Evaluation,[5] finding that Plaintiff experienced the medication side effects of dizziness, drowsiness, upset stomach, sleep problems, fatigue, blurred vision, and hand, leg, and foot swelling (Tr. 676). He stated that Plaintiff's GAF in the previous year had been as low as 40 and as high as 45[6] (Tr. 676). He found marked limitations in the ability to understand,

_____

[5]Also signed by Dr. Zethelius.

[6]

A GAF score of 31 to 40 indicates "some impairment in reality testing or

remember, or carry out detailed instructions; working with others; and extreme limitation in maintaining concentration for extended periods (Tr. 678). He found that Plaintiff's psychological problems exacerbated her physical symptoms (Tr. 679). He found that she would be required to miss about four days of work each month and that her work abilities were compromised by marijuana abuse (Tr. 680). He found that Plaintiff could manage her own benefit funds (Tr. 681).

## 2. Consultative and Non-Examining Sources

In August, 2013, Serena Jiddou, D.O. performed a one-time consultative physical examination on behalf of the SSA, noting Plaintiff's report of migrating pain due to fibromyalgia (Tr. 408). She reported that she could sit for 60 minutes, stand for 40, and walk for 30 (Tr. 408). Plaintiff reported that she was "always" sensitive to light (Tr. 408).

Plaintiff exhibited uncorrected 20/70 and 20/50 vision in the right and left eyes respectively (Tr. 409). She exhibited full muscle and grip strength but some discomfort upon squatting and recovering (Tr. 409). Range of motion studies were unremarkable (Tr. 411-412).

In September, 2013, Shanti Tanna, M.D. performed a non-examining review of the records related to Plaintiff's treatment for the physical conditions, finding that she was capable of lifting 20 pounds occasional and 10 frequently, sitting, standing, or walking for six hours in an eight-hour workday; and unlimited pushing/pulling (Tr. 81-83). Dr. Tanna precluded all climbing of ladders, ropes, or scaffolds and limited Plaintiff to frequent (as opposed to *constant*) balancing, stooping, kneeling, crouching, crawling, and climbing stairs and ramps (Tr. 82). Dr. Tanna found that Plaintiff was required to avoid concentrated

communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR*, at 34.

exposure to extreme cold but did not otherwise experience manipulative, visual, communicative, or environmental limitation (Tr. 82-83).

The same month, George Starrett, Ed.D. performed a non-examining review of the psychological records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace due to affective and anxiety-related disorders (Tr. 79-80). He concluded that Plaintiff was "capable of understanding, remembering and following simple instructions and completing simple repetitive tasks within the parameters of any imposed physical restrictions" (Tr. 84).

### C. VE Testimony

VE Shelton stated that her testimony would be consistent with the information found in the *Dictionary of Occupational Titles,* (*"DOT"*) (Tr. 57). She classified Plaintiff's past relevant work as a computer numeric controlled ("CNC") operator as skilled and exertionally sedentary (light as performed) and machine operator, semiskilled/medium; and inspector, skilled/light[7] (Tr. 57-58). The ALJ then posed the following question, describing a hypothetical individual of Plaintiff's age, education, and work experience:

> [A]ssume a person . . . [who] is able to do light work as it is defined by the regulations; who can never climb ladders, ropes, and scaffolds, but who can frequently do all the other posturals, including climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling; who can frequently be exposed to the non-weather-related extreme of . . . cold; who is limited to

---

[7]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

occupations requiring frequent near acuity; whose work has to be simple, routine, and repetitive (Tr. 58).

Based on the hypothetical limitations, the VE found that the individual would be unable to perform Plaintiff's past relevant work, but could perform the light, unskilled work of a marker (144,000 jobs in the national economy); garment sorter (223,000); and fast food worker (750,000) (Tr. 59). The VE testified that the need to miss more than one day of work each month, or, be off task for more than 15 percent of the day would be work preclusive (Tr. 60).

### D. The ALJ's Decision

Citing the medical records, ALJ Jones found that Plaintiff experienced the severe impairment of "affective disorder, anxiety disorder, uveitis, and fibromyalgia" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14-15). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 15).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [F]requently climb ramps and stairs; never climb any ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, and crawl; can frequently be exposed [to] non-weather related extremes of cold; limited to frequent occupations requiring near acuity of 20" or less; limited to simple, routine, and repetitive tasks (Tr. 16).

Citing the VE's testimony, the ALJ found that although Plaintiff was unable to perform her past relevant work, she could perform the light, unskilled work of a marker, garment sorter, and fast food worker (Tr. 20, 59).

The ALJ discounted the alleged degree of physical and psychological limitation, noting Plaintiff's history of "abuse of prescription opioids" and "false statements to prior physicians" (Tr. 17). He noted that Plaintiff had been discharged by two physicians "after episodes regarding narcotics" (Tr. 17). The ALJ cited Dr. Chang's observation that Plaintiff's reported stress was due to the trauma of losing her job and that her "condition would likely improve if she was to get her job back" (Tr. 17, 303).

The ALJ noted that while the medical records showed a history of uveitis, none of the treating records supported Plaintiff's allegations of light sensitivity (Tr. 18). He cited psychological treatment records showing full orientation, a normal thought process, and a cooperative demeanor (Tr. 18). He observed that the same records note Plaintiff's desire to return to her previous job (Tr. 18). He cited the August, 2013 consultative examination records showing a full range of motion, normal gait, and 5/5 muscle strength (Tr. 18). He accorded "little weight" to Dr. Zethelius/Jay Skaggs' medical source statement on the basis that it over-relied on Plaintiff's unsupported "subjective allegations" (Tr. 19).

## III.   STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either

way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-14-

# V. ANALYSIS

Plaintiff makes three arguments in favor of remand. *Plaintiff's Brief,* 10-24, *Docket #15*, Pg ID 755. First, she disputes the ALJ's rejection of Dr. Zethelius'/Jay Skaggs' December, 2014 finding of disabling psychological limitation. *Id.* at 15-19. Second, she argues that the ALJ did not comply with the requirements of SSR 12-2 in analyzing the condition of fibromyalgia. *Id.* at 19-20; 2012 WL 3104869 (July 25, 2012). Third, she contends that the ALJ erred at Step Three of the sequential analysis by finding that the psychological conditions of depression, PTSD, and anxiety did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 20-24.

Because Plaintiff's argument that her psychological conditions met at least one listed impairment (Argument 3) hinges on the weight accorded Dr. Zethelius'/Jay Skaggs' opinion of psychological disability (Argument 1) the Court reverses the order of discussion as to Arguments 2 and 3.

## A. The Treating Source Analysis

Plaintiff contends that the ALJ failed to provide an adequate rationale for declining to adopt Dr. Zethelius'/Jay Skaggs' December, 2014 opinion of psychological disability. *Plaintiff's Brief* at 15-17. She argues that the ALJ did not provide "good reasons" as required by 20 C.F.R. § 404.1527(c) for declining to accord controlling weight to the treating opinion[8]. *Id.*

---

[8]

Although Defendant contends that Dr. Zethelius' one-time September, 2014 assessment did not qualify him as a "treating" source, *Defendant's Brief,* 14, *Docket #20,* Pg ID 788, I find that the ALJ's discussion and rejection of the December, 2014 assessment meets the requirements of a treating physician analysis.

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)*(citing Wilson v. CSS,* 378 F.3d 541, 544 (6th Cir. 2004);§ 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, see *Warner v. CSS*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2)).

In the instance where the ALJ gives less than controlling weight to the treating physician opinion, he must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.   The failure to articulate "good reasons"  for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013).  "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

The ALJ made the following finding as to Dr. Zethelius'/Jay Skaggs' disability assessment:

> As for the opinion evidence, I have given the medical source statement filed by Sven Zethelius, M.D. little weight since it is inconsistent with the above RFC, focuses primarily on the subjective allegations of claimant, and fails to take all of the medical evidence of record based on a continual doctor/patient relationship into consideration. The record reflects inconsistencies in claimant's allegations yet the statement endorses those allegations as fact (Tr. 19).

The ALJ also found that in contrast to Dr. Zethelius'/Jay Skaggs' findings, the evidence as a whole supported an RFC for light work limited to "simple, routine, and repetitive tasks" (Tr. 19).

Plaintiff's argument that the ALJ did not abide by the requirements of § 1527(c)(2) in performing the treating source analysis is not well taken. First, the ALJ's finding that the Dr. Zethelius'/Jay Skaggs' assessment was entitled to little weight is prefaced by an accurate summation of the psychological treating records by both Dr. Zethelius and Dr. Salman (Tr. 15, 18). The ALJ noted that Dr. Zethelius' own evaluation records showed that Plaintiff was "concrete and otherwise logical, rational, and coherent" with no psychosis (Tr. 18). The ALJ cited Dr. Salman's treating records showing good eye contact, a cooperative attitude, full orientation, and the absence of concentrational limitations (Tr. 18). The ALJ also cited Plaintiff's own admission that she was able to take care of herself and her child; "drive and ride in a car;" walk one mile; and interact with friends on at least a weekly basis (Tr. 15). The ALJ's conclusion that the disability opinion was based largely on Plaintiff's subjective complaints is also supported by the record. For example, while Dr. Zethelius/Jay Skaggs found that the conditions of arthritis and bronchitis contributed to Plaintiff's inability to work (Tr. 676), rheumatologist Dr. Raza noted no evidence of arthritis as of May, 2012 (Tr. 342). Likewise, none of the records suggest that Plaintiff's work abilities were significantly

compromised by bronchitis.

Second, the record shows that the ALJ considered the applicable factors before declining to accord controlling weight to Dr. Zethelius' opinion. The ALJ's citation to Dr. Zethelius' September, 2014 psychiatric evaluation acknowledges that the evaluation was performed by a psychiatrist and pertained to Plaintiff's mental condition (Tr. 18). The ALJ went on to reject the December, 2014 disability opinion on the basis that (1) it was contradicted Dr. Zethelius' own treating records showing a lesser degree of psychological limitation, (2) contradicted by the treating records as a whole, and, (3) it was based on Plaintiff's subjective but unsupported allegations of limitation (Tr. 19).

My own review of the December, 2014 assessment supports the ALJ's determination. Dr. Zethelius' finding that Plaintiff experienced the medication side effects of drowsiness and dizziness is contradicted by her own statements that she no longer experienced fatigue from Tramadol at least as early as June, 2011 (Tr. 314). None of the records support Plaintiff's claim that she experienced "blurred vision" as a result of medication (Tr. 676). To the extent that Plaintiff may have reported blurred vision on rare occasions from uveitis, the records show that as of July, 2011, an examination of the eyes was unremarkable (Tr. 354) and Plaintiff reported only "rare" use of steroid drops for pain and sensitivity (Tr. 356). In May, 2012, Plaintiff again denied current symptoms of uveitis (Tr. 340).

Dr. Zethelius' finding of "marked" and "extreme" limitations in social functioning and concentration are also grossly contradicted by the treating records (Tr. 678). Dr. Salman's May, 2011 intake records and the subsequent treatment notes suggest that Plaintiff's psychological problems were brought on situational stressors of the death of her mother and the loss of her job rather than a disabling mental condition (Tr. 406). Indeed, treating records from November, 2011 state that Plaintiff was fighting to get her job back and that a return

to work would improve her level of anxiety (Tr. 303).   Dr. Salman's September, 2011 records state that Plaintiff went out regularly with friends (Tr. 400, 402).  April, 2013 records show that she had begun dating (Tr. 386).  Dr. Salman's records from just three months before Dr. Zethelius' disability opinion state (consistent with his earlier records) state that Plaintiff was appropriately dressed with a normal though process and good eye contact (Tr. 596).  Because the ALJ's rejection of Dr. Zetelius'/Skaggs' opinion is well explained andsupported, a remand on this basis is not warranted.

### B.  The Listings (Argument 3)

For the same reasons,  Plaintiff's claim fails to the extent that she argues that the conditions of depression and anxiety/PTSD meet either Listing 12.04 (affective disorders) or 12.06 (anxiety-related disorders).

At Step Three of the sequential analysis, a finding of two marked limitation in the three categories of (1) daily living (2) social functioning and, (3) moderate limitation in concentration, persistence, or pace resulting from the conditions of either depression or anxiety would result in a finding of disability.  *See* 20 CF.R. Part 404, Subpart P, Appendix 1 §§ 12.04(B), 12.06(B).  Dr. Zethelius'/Jay Skaggs' finding that Plaintiff experienced marked limitations in social functioning and marked and extreme concentrational limitation, if credited, would direct a finding of disability under either Listing 12.04 or 12.06 (Tr. 678-679).

However, substantial evidence generously supports the ALJ's finding that Plaintiff experienced only mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 15).  The ALJ cited Plaintiff's ability to perform household chores, care for her child, drive, walk a mile, and socialize with friends on a regular basis (Tr. 15).  Likewise, Skaggs' treating records note a "small but

healthy primary support group" (Tr. 548).

As to the finding of moderate concentrational limitations, the ALJ gave partial credit to Plaintiff's report that body pain caused some limitation in the ability to concentrate (Tr. 15). However, consistent with my own review of the transcript, the ALJ noted that the claims of physical and mental limitation were undermined by "a history of misuse and abuse of prescription opioids" (Tr. 17). Dr. Chang's records state that he refused to prescribe Vicodin "for pain that we are not clear about" and that Plaintiff "was very demanding as to getting [narcotic] pain meds" (Tr. 307). Likewise, Dr. Richardson's records state that he was discharging her as a patient on the basis that she had been "overusing" both Xanax and Vicodin (Tr. 297). Emergency room notes state that Plaintiff requested but was denied "pain medicine to go" (Tr. 614). Both Dr. Zethlelius'/Jay Skaggs' assessment and Dr. Salman's treating records contains acknowledgment that Plaintiff's alleged concentrational limitations were exacerbated by "marijuana abuse" (Tr. 303, 680). Moreover, despite evidence suggesting that Plaintiff's concentrational abilities were compromised as much by substance abuse as body pain, Dr. Salman's records show that she consistently displayed normal concentrational abilities[9] (Tr. 392, 395, 400, 402, 405).

Accordingly, the ALJ did not err in finding that the conditions of anxiety and depression did not create disabling limitation.

---

[9]In reply, Plaintiff asserts that Dr. Salman "rated her as incapable of performing work" on June 1, 2011. *Reply,* 2 (*citing* Tr. 407), *Docket #21,* Pg ID 796. However, neither the transcript page cited by Plaintiff nor any other records created the same day state or can be construed to state that Dr. Salman believed that she was "incapable of performing work."

## C. Fibromyalgia (Argument 2)

 Plaintiff also argues, in effect, that the ALJ gave short shrift to the medical records supporting a finding of disability resulting from fibromyalgia. *Plaintiff's Brief* at 19-20. She argues that the ALJ failed to evaluate her symptoms in accordance with SSR 12-2p which pertains to the evaluation of symptoms caused by fibromyalgia. *Id.*

Under SSR 12-2p, a finding that a claimant has the medically determinable impairment ("MDI") of fibromyalgia requires a diagnosis by an "acceptable medical source." 2012 WL 3104869, *2 (July 25, 2012). The evidence must also "document that the physician reviewed the person's medical history and conducted a physical exam." *Id.* Here, the ALJ acknowledged both that the condition was an MDI and that Plaintiff experienced the severe impairment of fibromyalgia based on Dr. Raza's July, 2011 preliminary diagnosis of fibromyalgia (Tr. 359) and his later clinical findings confirming the diagnosis (Tr. 346). Thus, the question of whether she has established that fibromyalgia constitutes a MDI is resolved.

Nonetheless, the mere finding that the condition is an MDI and a severe impairment does not establish disability. SSR 12-2p directs that in determining whether the condition creates disability level limitation, the ALJ must also analyze the record pursuant to SSR 96-7p, 1996 WL 362209 (July 2, 1996).[10] *Id.* at *5 The applicable prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case

---

[10]More commonly, the SSR 96-7p analysis is currently used in making credibility determinations.

record."*Id.* [11]

The ALJ did just that.  Citing SSR 96-7p, he acknowledged Plaintiff's claims that fibromyalgia caused "problems with physical exertion, memory, concentration, and interacting with others" (Tr. 16-17).  However, he found that Plaintiff's allegations of *disabling* limitation were contradicted by the record.  The ALJ cited treating records stating that Plaintiff experienced relief in symptoms of fibromyalgia with medication and exercise (Tr. 17).  He noted that the August, 2013 consultative examination showed that Plaintiff did not require assistive devices and demonstrated a full range of motion, full grip strength, and a normal gait (Tr. 18).  In crafting the RFC, the ALJ accounted for the consultative examiner's observation of difficulty squatting, a positive straight-leg raise, and increased sensation to pinprick by precluding all climbing of ropes, ladders, or scaffolds, and imposing restriction in balancing, stooping, kneeling, crouching, crawling, and exposure to cold (Tr. 16).

Substantial evidence otherwise supports the ALJ's conclusion that the symptoms of fibromyalgia were limiting but not disabling (Tr. 16).  In July, 2011, Dr. Raza made a

---

[11]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in addressing the second prong of SSR 96-7p:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

preliminary diagnosis of fibromyalgia but found tenderness only in the cervical and upper thoracic spine (Tr. 359). Dr. Raza's recommendation that Plaintiff "stay active" and "start swimming" further supports the finding that the condition was not disabling (Tr. 359). The treatment records state that she experienced an improvement in symptoms with Cymbalta (Tr. 356). Dr. Raza's notes from five months later state that the symptoms of fibromyalgia were "episodic" and that Plaintiff declined a recommendation for physical therapy (Tr. 350). While the "waxing and waning" nature of fibromyalgia symptoms could in some instances preclude all gainful employment, Dr. Raza's statement that the fibromyalgia was "episodic," coupled with Plaintiff's infrequent treatment, suggests that the condition caused only sporadic or rare symptomology. The records show that as of May, 2012, Dr. Raza elected to see Plaintiff on an "as needed" rather than regular basis (Tr. 342). Significantly, Plaintiff did not seek additional treatment from Dr. Raza for another 18 months although during that period she sought regular treatment for other conditions (Tr. 671).

Moreover, the fact that the administrative determination does not make reference to SSR 12-2p does not provide grounds for remand. In *Luukkonen v. Commissioner of Social Security*, 653 Fed.Appx. 393, 399–400 (6th Cir. June 22, 2016), the Court found that the omission of citation to SSR 12-2p was at most, harmless error where "the ALJ concluded (1) that Plaintiff did have fibromyalgia, and (2) that her fibromyalgia constituted a "severe impairment" under the second step of the five-step analysis" and, (3) properly cited SSR 96–7p in finding that the condition did not cause disabling limitations. *Luukkonen,* at 399-400 ("In sum, although the ALJ did not explicitly cite SSR 12–2p, it nevertheless applied the Ruling's principles. That is all that is required under our precedents")(internal citations omitted).

In closing, I recognize that the record shows some degree of physical and psychological limitation. As such, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's limitations or personal challenges. Nonetheless, the ALJ's determination that she was capable of a significant range of unskilled light work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 11, 2017      s/R. Steven Whalen
                        R. STEVEN WHALEN
                        UNITED STATES MAGISTRATE JUDGE

---

**CERTIFICATE OF SERVICE**

**I hereby certify on August 11, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants August 11, 2017.**

                      **s/Carolyn M. Ciesla**
                      **Case Manager for the**
                      **Honorable R. Steven Whalen**